## STATE OF CONNECTICUT *v.* VICTOR CRESPO
### (AC 33493)

Bear, Alvord and Sheldon, Js.

548

Argued February 19—officially released September 10, 2013

*Megan L. Weiss*, deputy assistant public defender, with whom was *Martin Zeldis*, public defender, for the appellant (defendant).

*Leonard C. Boyle*, deputy chief state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Nicholas J. Bove, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Victor Crespo, appeals from the judgment of conviction, rendered after a jury trial, of carrying a pistol or revolver without a permit in violation of General Statutes § 29-35, unlawful possession of a weapon in a motor vehicle in violation of General Statutes § 29-38 and possession of an assault weapon in violation of General Statutes § 53-202c. The defendant claims that (1) the trial court improperly denied his motion to suppress evidence; (2) the trial court improperly denied his motion to suppress oral and written statements; (3) the trial court improperly denied his motion to disclose the identity of a confidential informant; (4) there was insufficient evidence to sustain his conviction of carrying a pistol or revolver without a permit; and (5) the trial court improperly denied his motion for a mistrial, which was based on alleged judicial misconduct due to improper criticisms of defense counsel in the presence of the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 18, 2010, at approximately 10:45 p.m., Officer Hugo Stern of the Bridgeport Police Department received a tip from a confidential informant[1] (informant) that he/she had been approached by a man

---

[1] The state presented testimony that the confidential informant was a concerned citizen, known to Stern, who had provided reliable information to Stern during the five year period preceding the defendant's arrest, resulting in approximately five arrests.

(seller) in the parking lot of the T Market in Bridgeport offering to sell the informant an Uzi-type pistol. The informant described the seller as a "Hispanic male" with a "[s]lender build, approximately five-seven, [wearing] a black jacket, blue jeans, and . . . a multicolor knitted hat . . . ." The informant stated that the gun was wrapped in a black plastic garbage bag. The informant told Stern that the seller had removed the gun from a white van bearing Connecticut registration plate 98CB28, which was parked in the parking lot of the T Market.[2] Armed with this information, Stern called Officer Frank Delbouno of the Bridgeport Police Department, requesting that Delbouno meet him at the T Market. Stern arrived at the T Market approximately ten minutes later to investigate the informant's tip.

Upon his arrival at the T Market, Stern immediately saw the defendant standing a few feet away from a white van, which was parked in the parking lot of the T Market. Satisfied that the defendant matched the informant's description of the seller, Stern exited his police cruiser, drew his weapon and ordered the defendant to raise his hands; the defendant complied. After conducting a patdown search of the defendant, which did not produce any weapons, Stern ordered the defendant to lie on the ground; the defendant again complied. Thereafter, Delbouno arrived at the scene to provide backup. Because the side door to the van was completely open, Stern was able to see a black plastic garbage bag inside it, which was similar to that which the

---

[2] The court issued a limiting instruction regarding Stern's testimony as to information that he allegedly received from the informant: "That evidence is hearsay and is not admitted to prove anything that the . . . informant said is true, and you may not consider that testimony in any way whatsoever as proof that the defendant is guilty of any part of any of the crimes charged. That testimony was allowed for the limited purpose of explaining why . . . Stern did what he said he did on January 18 of 2010. For example, why he went to the location in question and why he acted in the manner described by his other testimony, but not why he arrested [the defendant]."

informant had described. Stern ordered Delbouno to seize the bag, which he did. Inside the bag, Delbouno found a loaded, semiautomatic Uzi-type pistol.

While Delbouno was securing the gun, the defendant volunteered, without interrogation, that the van "was his vehicle . . . ." Thereafter, Stern arrested the defendant. After Stern placed the defendant in the backseat of his police cruiser, the defendant voluntarily stated, again unprompted by interrogation, that "he was holding the weapon for Fats, who was supposed to meet him later . . . in exchange for some heroin folds."[3] The informant subsequently appeared on the scene and identified the defendant as the man who had attempted to sell him the gun. The informant further confirmed that the defendant's van was the vehicle from which the seller had retrieved the gun. The defendant was then transported to Bridgeport police headquarters.

At approximately 10 a.m. the following morning, January 19, 2010, Detective Paul Ortiz of the Bridgeport Police Department approached the defendant and asked him to make a statement.[4] The defendant agreed and executed a waiver of rights, at which time Ortiz advised him of his *Miranda* rights. See footnote 3 of this opinion. The defendant then provided a written statement to Ortiz in which he stated that he had agreed to "hold the firearm" in exchange for heroin.

The defendant was charged on the basis of the previously described seizures and statements with one count each of carrying a pistol or revolver without a permit in violation of § 29-35, unlawful possession of a weapon in a motor vehicle in violation of § 29-38 and

---

[3] The defendant was not advised of his *Miranda* rights before making the voluntary oral statements. See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Ortiz was assigned to a United States Bureau of Alcohol, Tobacco, Firearms and Explosives task force and interviewed all persons arrested with a gun in Bridgeport.

possession of an assault weapon in violation of § 53-202c. The defendant filed motions to suppress all physical evidence obtained by the police as well as all statements he had made to Stern and Ortiz. The defendant also moved for disclosure of the informant's identity. Following an evidentiary hearing, the trial court denied the defendant's motions.

The defendant was tried by a jury and found guilty on all counts. The court rendered judgment accordingly and sentenced the defendant to a total effective term of ten years incarceration, of which one year was a mandatory minimum that could not be suspended or reduced by the court, pursuant to General Statutes § 29-37. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his motion to suppress evidence related to his possession of the gun, arguing that the officers lacked probable cause to believe that the van contained contraband or evidence of a crime when they searched it and found the gun. Specifically, the defendant contends that the information provided by the informant was insufficient to support a finding of probable cause, and, thus, that the evidence seized from his vehicle should have been suppressed as the fruit of an unlawful search and seizure. We disagree.

In denying the defendant's motion to suppress evidence, the trial court found the following relevant facts. Stern received a tip from a reliable informant that a man had attempted to sell an Uzi-type gun in the parking lot of the T Market. The informant described the seller's physical appearance, clothing and vehicle. The informant further stated that the gun had been wrapped in a black plastic garbage bag, located in the van. Stern

previously had received accurate and useful information from the informant, which had led to approximately five arrests. The court found that the informant was not anonymous and that the informant's basis of knowledge for the tip was derived from his/her personal interaction with the defendant.

Within ten minutes of receiving the informant's tip, Stern arrived at the T Market to conduct an investigation into the proposed sale of the firearm. Stern immediately saw the defendant, who matched the informant's description of the seller, standing next to a van that matched the informant's description of the seller's vehicle. Stern subsequently secured the defendant on the ground. Because the side door of the van was completely open, Stern was able to observe a black plastic garbage bag inside it, which matched the informant's description of the bag containing the gun. Stern ordered Delbouno—who, at that moment, had arrived at the scene to provide backup—to seize the bag. Delbouno recovered an Uzi-type pistol containing live ammunition from inside the bag. In its oral decision, the trial court concluded "that the totality of the circumstances suggests that the police had probable cause to conduct a warrantless search of [the defendant's] vehicle."

"It is axiomatic that [u]nder the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial

court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

"The [f]ourth [a]mendment to the United States constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable [searches] and seizures. Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception. . . . One such exception is the automobile exception. In *Carroll* v. *United States*, 267 U.S. 132, 153, 155–56, 45 S. Ct. 280, 69 L. Ed. 543 (1925), the United States Supreme Court held that, due to the inherent mobility of vehicles, it is permissible under that exception to the warrant requirement of the fourth amendment to conduct a warrantless search of an automobile for criminal evidence or contraband so long as the search is supported by probable cause.

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state

constitution, is made pursuant to a totality of circumstances test. . . . Under the *Gates*[5] test, a court must examine all of the evidence relating to the issue of probable cause and, on the basis of that evidence, make a commonsense, practical determination of whether probable cause existed. . . . [Our Supreme Court has] said that the question is whether there was a fair probability that the contraband was within the place to be searched. . . . Where . . . the police relied on information provided to them by an informant, an examination of the informant's reliability (or veracity) and the basis of his or her knowledge should be regarded as highly relevant in determining whether, under the totality of the circumstances, probable cause existed." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Duffus*, 125 Conn. App. 17, 24–26, 6 A.3d 167 (2010), cert. denied, 300 Conn. 903, 12 A.3d 572 (2011).

Here, the record supports the trial court's finding that the informant was reliable. First, the informant was not anonymous. "The fact that an informant's identity is known to police carries substantial weight in assessing reliability because the informant could expect adverse consequences if the information that he provided was erroneous. Those consequences might range from a loss of confidence or indulgence by the police to prosecution for the class A misdemeanor of falsely reporting an incident under General Statutes § [53a-180c], had the information supplied proved to be a fabrication." (Internal quotation marks omitted.) Id., 26. Further, prior to this case, Stern had worked with the informant for approximately five years, during which time the informant had provided Stern with reliable information that resulted in approximately five arrests.

[5] See *Illinois* v. *Gates*, 462 U.S. 213, 230–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).

The fact that Stern was able to corroborate and confirm the informant's tip further supports an inference that the informant was reliable. See *State* v. *Smith*, 257 Conn. 216, 226, 777 A.2d 182 (2001) ("police investigation confirming details of [an] informant's report may establish that the informant obtained the information in a reliable way"). Here, the informant told Stern that a man tried to sell him a gun in the parking lot of the T Market. The informant described the seller's physical description and attire, which matched that of the defendant. The informant also gave Stern the description, location and license plate number of the seller's vehicle, all of which were confirmed by Stern upon his arrival at the T Market. Corroboration of such specific and timely information supports a finding that the informant was reliable.

The record further demonstrates that the informant had a basis of knowledge regarding his information sufficient to sustain a finding of probable cause. Our Supreme Court has stated that "the surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him first-hand information . . . [as] when a person indicates he has overheard the defendant planning or admitting criminal activity . . . ." (Internal quotation marks omitted.) *State* v. *Johnson*, 286 Conn. 427, 440, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008). In the present case, the informant reported to Stern that his/her information came directly from an in-person conversation that he/she had had with the defendant in the immediate area of the defendant's van prior to calling Stern. That conversation constituted firsthand information supporting an inference of the informant's basis of knowledge. See *State* v. *Orellana*, 89 Conn. App. 71, 82, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005).

On the basis of the record, we conclude that the police had probable cause to conduct a warrantless search of the defendant's vehicle for an Uzi-type pistol wrapped in a black garbage bag. In light of the detailed information provided by the informant, as corroborated by Stern, the informant's basis of knowledge with respect to such information, and the fact that Stern knew and had worked successfully with the informant in the past, there was probable cause to believe that the pistol would be found in the defendant's vehicle. Accordingly, we conclude that the court properly held that the search of the defendant's vehicle was constitutionally permissible pursuant to the automobile exception to the warrant requirement.

II

The defendant next claims that the trial court improperly denied his motion to suppress oral and written statements. As to the defendant's oral statements, which he made to Stern, the defendant argues that "[t]he court's findings of fact based on the flawed testimony of Stern and against the weight of other uncontroverted evidence is clearly erroneous." As to the defendant's written statement, which he made to Ortiz, the defendant argues that, because he was not presented in court on January 19, 2010,[6] the day following his arrest, as required by General Statutes § 54-1c, the statement was rendered inadmissible. We will address these claims in turn.

Prior to trial, the defendant filed a written motion to suppress his statements to the police on the ground that his *Miranda* rights had been violated. In his motion, the defendant asserted that the statements were not voluntarily made and that he did not knowingly, voluntarily and intelligently waive his constitutional rights. During the suppression hearing, defense counsel

---

[6] January 18, 2010, was a Monday.

argued, as an additional basis for suppression, that the defendant's written statement should be deemed inadmissible pursuant to § 54-1c. After holding an evidentiary hearing, the court issued an oral decision denying the defendant's motion.

In rendering its decision, the court found the following relevant facts. After the officers discovered the gun, "[t]he defendant volunteered, without interrogation, that the van was his vehicle. Following the statement, he was placed under arrest. The defendant made additional statements after being arrested, and before being advised of his *Miranda* rights . . . .

"As stated earlier, the confidential informant did appear at the scene, and in addition to identifying the defendant as the person who attempted to sell him the Uzi-type weapon, also identified the van as the vehicle operated by [the defendant]. Also, as noted earlier, the defendant was standing by the van with the side doors open, and the visibility of [Stern] was very clear. During this time, the defendant voluntarily stated that the van was his vehicle, and [the defendant was then] handcuffed and placed under arrest. [The defendant] offered information, which was unsolicited and not the result of police interrogation. He stated that he got the weapon from someone named Fats who gave him the weapon [to hold] in exchange for heroin [that he promised to deliver at a later time].

"[The defendant] was transported to the Bridgeport Police Department having been placed under arrest after the recovery of the firearm." "On January, 19, 2010, at about 10 or 11 a.m., the defendant was approached by [Ortiz] in order . . . to take a statement from the defendant. The defendant was provided with his *Miranda* warnings by [Ortiz]. . . . Prior to filling out the [form], the defendant was advised by [Ortiz] of the entire form, which was read to him by [Ortiz]. [Ortiz] further had

the defendant read the form out loud and [initial] each sentence as he read it. . . .

"[The defendant] made a handwritten statement wherein he volunteered information to [Ortiz], which was relevant to the instant case . . . . [The defendant] provided a handwritten statement, written by [the defendant] and not in a question and answer format."

In denying the defendant's motion to suppress, the court found that the defendant's oral admissions made to Stern were "voluntarily stated . . . and not the result of police interrogation." As to the defendant's written statement, the court found: "[I]t is clear to this court that the defendant freely, intelligently and knowingly and voluntarily waived his rights against self-incrimination, and provided [Ortiz] with a statement without any threat or promises by [Ortiz] or any other law enforcement officer." The court, however, did not specifically address the defendant's statutory argument, which was based upon § 54-1c.

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence." (Internal quotation marks omitted.) *State* v. *Mullien*, 140 Conn. App. 299, 306, 58 A.3d 383 (2013).

A

As to his oral statements to Stern, the defendant claims that the court improperly "made factual determinations that were clearly erroneous in consideration of the record created during the hearing on the motion to suppress because the findings were based on testimony that had been shown to be inaccurate." The gravamen

of the defendant's claim is that, because Stern's testimony at the suppression hearing that he personally had transported the defendant to the Bridgeport Police Department was proven to be inaccurate by counsel's introduction of police records, Stern's entire testimony was rendered unreliable. Because of that error in Stern's testimony, the defendant contends, the court's findings that the defendant made certain oral statements to Stern were clearly erroneous. We disagree.

It is axiomatic that "[i]t is not this court's function to assess the credibility of witnesses. Rather, [i]t is the sole province of the trial court to assess the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Linarte*, 107 Conn. App. 93, 107, 944 A.2d 369, cert. denied, 289 Conn. 901, 957 A.2d 873 (2008). The court found that the defendant made inculpatory oral statements to Stern immediately before and shortly after his arrest. In addressing the issues now raised on appeal by the defendant, the court found: "Now, the court considered the claims of the defendant, and the court does not believe that whether the defendant was transported by [Stern] or another police officer has any bearing on the admissibility of [the oral statements], which were made by the defendant to [Stern]. Whether they were made . . . when [Stern was] driving . . . his cruiser, or they were made when [Stern] was inside of [his] cruiser getting the information together is of no consequence. [The] fact is that [the defendant] was not under interrogation or any coercion, and the court so finds." The court's findings that the defendant voluntarily made the oral statements properly rested on Stern's testimony, which the court credited. It is not our function to assess the credibility of witnesses. Accordingly, we conclude that the court's findings were not clearly erroneous and that its denial of the defendant's motion to suppress the oral statements was supported by the evidence before it.

## B

As to the defendant's written statement, he claims that the court denied his motion to suppress in violation of § 54-1c.[7] The defendant specifically argues that, because the police officers failed to present him in court for arraignment in compliance with § 54-1c, his written statement should have been ruled inadmissible. We disagree.

According to the defendant, because he was arrested on January 18, 2010, he should have been presented in court on January 19, 2010. Because he was not in fact presented until January 20, 2010, the defendant contends that, pursuant to § 54-1c, his written statement should have been suppressed. In opposition to this claim, the state argues that, although "§ 54-1c makes inadmissible an admission made by a defendant who

[7] The record is sufficient for us to review the defendant's claim that the trial court improperly denied his motion to suppress the written statement on the basis of its determination that § 54-1c did not render that statement inadmissible. Although the defendant properly raised this statutory claim during the suppression hearing, the trial court did not explicitly address this issue in its oral decision denying the defendant's motion to suppress. After rendering its oral decision, the following colloquy ensued:

"[Defense Counsel]: Just to close up one last thread. Does Your Honor intend to articulate a ruling as to the request for suppression based on [§ 54-1c]? [I]t was just something that was not addressed in Your Honor's earlier oral [decision].

"The Court: I don't intend to . . . articulate anything further on the suppression hearing items . . . ."

Nevertheless, "when we determine that any of the issues raised on appeal present purely questions of law warranting plenary review, the issues may be reviewed despite the absence of [an articulation of a ruling] because the legal analysis undertaken by the trial court is not essential to this court's consideration of the issues on appeal." *State* v. *James*, 93 Conn. App. 51, 57 n.6, 887 A.2d 923 (2006). It thus bears emphasis that our resolution of the defendant's claim ultimately gives rise to an issue of statutory construction over which our review is plenary. *State* v. *Ramos*, 271 Conn. 785, 791, 860 A.2d 249 (2004). Accordingly, because we review de novo the defendant's claim that the court improperly concluded that § 54-1c did not render inadmissible his written statement, the record is adequate for review of that claim.

has not been presented at the next session of court
. . . [t]he statute is silent . . . as to how any admissions made prior to the normal time of presentment must be addressed." (Emphasis omitted.) The state thus contends that, "[b]ecause the clear intention of § 54-1c is to prohibit the admission of a defendant's inculpatory statements when made after a period of unnecessary delay, the trial court's denial of the defendant's motion to suppress should be affirmed." We agree with the state.

The resolution of the defendant's claim ultimately gives rise to an issue of statutory construction over which our review is plenary. *State* v. *Ramos*, 271 Conn. 785, 791, 860 A.2d 249 (2004). Our review of § 54-1c is guided by well established principles, the fundamental objective of which is to ascertain the intent of the legislature. *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 135, 827 A.2d 659 (2003). "[General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretative guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *State* v. *Drupals*, 306 Conn. 149, 159, 49 A.3d 962 (2012).

In accordance with § 1-2z, we begin our analysis by reviewing the text of the statute. In Connecticut, a statutory prompt arraignment scheme governs the admissibility of statements given by defendants who have not

been arraigned within the time frame as prescribed by that scheme. Section 54-1c provides: "Any admission, confession or statement, written or oral, obtained from an accused person who has not been presented to the first session of the court, or on the day specified for arraignment under the provisions of section 54-1g, or who has not been informed of such person's rights as provided by section 54-1b or 54-64b, shall be inadmissible."

The defendant claims that, if an accused person ultimately is not presented at the next session of court, as prescribed by the statutory scheme set forth in § 54-1c, any admission, confession or statement previously obtained from him must be suppressed. Because we conclude that the legislature did not intend to create such a per se exclusionary rule regarding the admissibility of inculpatory statements, we look to extratextual evidence of the meaning of § 54-1c to resolve the defendant's claim. See *State* v. *Courchesne*, 296 Conn. 622, 710, 998 A.2d 1 (2010) ("it is axiomatic that those who promulgate statutes . . . do not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results" [internal quotation marks omitted]).

The legislative history of § 54-1c reveals that its purpose was to promote "the right of the accused to have counsel, which would prevent the police from incommunicado holding. That [is, the police] would have the right for at least [twenty-four hours] for proper interrogation of the accused, but would have to present them to the Circuit Court or to a Superior Court within the next court day." 10 H.R. Proc., Pt. 5, 1963 Sess., p. 1728, remarks of Representative Robert J. Testo. Explaining the bill, Representative Robert Satter stated: "It is a bill that gives the [right] to counsel at the critical moment when a person most needs counsel, namely at the point [shortly after being] arrested, and where he is being brought for an arraignment." Id., p. 1730. Speaking in

support of the bill, Representative F. Timothy McNamara stated: "[T]his bill places the [s]tate of Connecticut in line with the rules that the [f]ederal [c]ourts [had] placed on the [f]ederal authorities." Id., p. 1732.

At the time § 54-1c was enacted, the rule of *McNabb* v. *United States*, 318 U.S. 332, 63 S. Ct. 608, 87 L. Ed. 819 (1943), and *Mallory* v. *United States*, 354 U.S. 449, 77 S. Ct. 1356, 1 L. Ed. 2d 1479 (1957), controlled the presentation of accused persons in federal courts. That rule "generally [rendered] inadmissible confessions made *during* periods of detention that [violated] the prompt presentment requirement of [the federal presentment rule]." (Emphasis added; internal quotation marks omitted.) *Corley* v. *United States*, 556 U.S. 303, 309, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009). "[T]he plain purpose of the requirement that prisoners should promptly be taken before committing magistrates was to check resort by officers to secret interrogation of persons accused of crime." (Internal quotation marks omitted.) Id.

In light of the legislative history and circumstances surrounding the enactment of § 54-1c, we conclude that the intent of the legislature was to create a prompt arraignment scheme, which prohibited the admission of statements given *after* the period of delay and obtained by the police as the result of such impermissible conduct. The purpose of that scheme was to ensure that an accused person promptly would be afforded the full panoply of safeguards provided at the initial appearance—the statutorily prescribed critical moment when a person most needs the advice of counsel. Read in this context, § 54-1c renders inadmissible any admission, confession or statement given by an accused person who remains in state custody *after* the time at which he should have been presented in court. The remedy of § 54-1c does not, however, invalidate any or

all statements made by a defendant prior to that time due to later, unrelated wrongdoing by the police in prolonging the period of his pre-presentment detention.[8] This interpretation is entirely consistent with pre-existing federal practice under the *McNabb-Mallory* rule; see *Culombe* v. *Connecticut*, 367 U.S. 568, 599 n.50, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961) (it is axiomatic that confessions made during period following arrest and before delay becomes unlawful are not to be excluded under *McNabb-Mallory* rule); see also *United States* v. *Mitchell*, 322 U.S. 65, 70, 64 S. Ct. 896, 88 L. Ed. 1140 (1944) (subsequent illegal detention did not render inadmissible prior confessions); which the statute sought to adopt and enforce in Connecticut. Accordingly, the defendant's claim that the court improperly denied his motion to suppress in violation of § 54-1c fails.

## III

The defendant also claims that the trial court abused its discretion in denying his motion for disclosure of

[8] There are two situations in which § 54-1c may render a defendant's statement inadmissible. First, and most obviously, the statute provides grounds for suppression when a statement by a defendant is obtained by police *after* the time at which the defendant should have been presented to the court for arraignment. Second, a statement may be rendered inadmissible when it is obtained by police *before* the time at which the defendant should be arraigned, but the process of obtaining it causes a delay in presentment. As to the former scenario, although the court made no factual findings on the matter, there is no suggestion by the defendant that the defendant's statement was taken after the time at which he should have been presented to the court for arraignment. As to the latter scenario, while we recognize that "delay for the purpose of interrogation is the epitome of 'unnecessary delay . . . .' "; *Corley* v. *United States*, supra, 556 U.S. 308; the defendant has not raised a claim that Ortiz' interrogation of him led ultimately to the failure of the state to present him to the court for arraignment in accordance with § 54-1c. Instead, the defendant confines his claim to the overly broad contention that, if the prompt arraignment requirements of § 54-1c are violated, any admission, confession or statement previously obtained must be suppressed. In the absence, therefore, of fact-finding by the court that Ortiz' interrogation of the defendant caused any delay in presenting him for arraignment, coupled with the defendant's failure to claim that his statement was the fruit of impermissible police conduct, we have no occasion to conclude

the identity of the informant. Specifically, he claims that "the court could not reasonably have concluded that there were sufficient indicia of reliability to apply the privilege of nondisclosure to this informant." We disagree.

The following facts, which reasonably could have been found by the jury, are relevant to our resolution of the defendant's claim. The defendant filed a pretrial motion requesting disclosure of the identity of the informant who had provided Stern with the tip regarding the alleged attempted sale of a gun in the parking lot of the T Market. The court conducted an evidentiary hearing on the motion. At that hearing, Stern testified that the informant had contacted him, stating that the informant had been approached by the seller in the parking lot of the T Market offering to sell the informant an Uzi-type pistol. The informant previously had provided useful and accurate information to Stern, leading to approximately five arrests. Stern further testified that the informant had been promised anonymity and that his continuing relationship with the informant was based on maintaining strict confidentiality regarding the informant's identity.

The informant told Stern that the seller was located in the parking lot of the T Market in his white van. The informant further stated that the gun had been wrapped in a black plastic garbage bag, which the seller had removed from his van. The informant provided Stern with a detailed physical description of the seller. Thereafter, Stern contacted Delbouno, requesting that he meet him at the T Market to provide backup, and drove to the T Market to investigate and corroborate the informant's tip. Upon his arrival at the T Market, Stern observed the defendant standing next to a white van.

that the court improperly denied the defendant's motion to suppress the written statement on the basis of § 54-1c.

Satisfied that the defendant and his vehicle matched the informant's description of the seller and his vehicle, Stern secured the defendant. Stern observed in the defendant's van a black plastic garbage bag, which he ordered Delbouno to seize. Delbouno recovered an Uzi-type pistol from within the bag. Prior to the defendant's arrest, the informant arrived on the scene and identified the defendant as the seller and the defendant's van as the seller's vehicle. On the basis of this evidence, the court denied the defendant's motion for disclosure.

"As a threshold matter, we set forth the standard by which an appellate court may review the propriety of a trial court's decision [regarding a motion for] disclosure. It is a basic tenet of our jurisprudence that we afford deference to the trial court and assess the trial court's conclusions pursuant to an abuse of discretion standard. . . . [T]he determination of whether an informer's identity shall be revealed is reviewed as a matter involving the exercise of discretion by the court. . . . In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . .

"In *Roviaro* v. *United States*, [353 U.S. 53, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957)], the United States Supreme Court had occasion to define the nature and scope of the informant's privilege. What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. . . . The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving

their anonymity, encourages them to perform that obligation. . . .

"*Roviaro* established a test for assessing challenges to the applicability of the informant's privilege. This test involves the balancing of two competing interests: (1) the preservation of the underlying purpose of the privilege; and (2) the fundamental requirements of fairness. . . . The underlying purpose of the privilege is to protect the public interest in the flow of information to law enforcement officials. The fundamental requirements of fairness comprise the defendant's right to a fair trial, including the right to obtain information relevant and helpful to a defense. . . . Whether [disclosure is warranted depends] on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. . . .

"Once the state has invoked the privilege, it is then the defendant's burden to show that the balance of the evidence falls in favor of disclosure. . . . When the defendant demonstrates that disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense, or is essential to a fair determination of a cause, the government's privilege must yield. . . . Disclosure is essential to the defense where nondisclosure could hamper the defendant's right to a fair trial, such as where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence. . . . Specific defenses that may merit disclosure include entrapment, mistaken identity and lack of knowledge. . . . Mere speculation that the informant's information will be helpful to the defense is not sufficient to mandate disclosure. . . . Before a court will compel disclosure, the informant typically

must be a participant in the alleged crime or an eyewitness thereto. . . . [C]ourts generally agree that if the informant provides information to law enforcement officers without any further involvement, disclosure must yield to the protection of the informant." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Messam*, 108 Conn. App. 744, 748–50, 949 A.2d 1246 (2008).

The defendant argues that disclosure of the informant's identity was required in this case because Stern's testimony did not sufficiently establish the reliability of the informant. Specifically, the defendant contends that "Stern could not name any convictions that had been a result of the information from this [informant], and we certainly do not have another officer that could corroborate the information. . . . Here we only have the faulty testimony of Stern." (Citation omitted.) The defendant further argues that "Stern could not even say if the [informant] had a criminal record, because he had never checked. From this the court could not have made any determination if the [informant] had a record of dishonesty." We disagree.

In *State* v. *Kiser*, 43 Conn. App. 339, 349, 683 A.2d 1021, cert. denied, 239 Conn. 945, 686 A.2d 122 (1996), cert. denied, 520 U.S. 1190, 117 S. Ct. 1478, 137 L. Ed. 2d 690 (1997), as in the present case, there was "no indication that the confidential informants were participants in the crimes with which the defendant was charged." The informants in *Kiser* had told the police about narcotics sales. This court stated in that case: "The charges against the defendant did not include the sale of a narcotic or controlled substance but were limited to possession with intent to sell. Moreover, the defendant conceded at trial that the informants were neither witnesses to nor participants in the crimes with which the defendant was charged. Thus, the informants

did nothing more than provide the police with information that was included in the application for a search and seizure warrant. It was the evidence that was discovered in the course of the search that gave rise to the defendant's convictions, not the information used to establish probable cause for the warrant. When the evidence discloses that the informer was merely an informer and nothing more the government is not compelled to disclose his identity." (Emphasis omitted; internal quotation marks omitted.) Id.

Similarly, in the present case, the informant provided Stern with information that gave the police probable cause to search the defendant's vehicle. Stern arrested the defendant after Delbouno recovered the firearm from the van, which the defendant voluntarily stated that he owned. The resulting arrest and charges were based on events in which the informant was not involved. The charges against the defendant did not include the alleged attempted sale, which the informant reported in his tip to Stern. The informant, therefore, was not a key witness or participant in the crime charged.[9]

Further, the court's decision rested on the testimony of Stern, the officer with whom the informant communicated. "Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and

---

[9] Although Stern testified that the informant had reported seeing the defendant physically holding an Uzi-type pistol during the alleged attempted sale thereof, such evidence was not the basis for the defendant's conviction, for use of Stern's testimony was strictly limited by the court in its instructions to the jury. See footnote 2 of this opinion.

to draw necessary inferences therefrom. . . . As a practical matter, it is inappropriate to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record. . . . We, therefore, defer to the trial court's credibility assessments and conclude that there was ample evidence in the record to support the trial court's findings and conclusions." (Internal quotation marks omitted.) *State* v. *Hunt*, 72 Conn. App. 875, 884, 806 A.2d 1084, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002). Accordingly, we conclude that the court did not abuse its discretion in denying the defendant's motion for an order directing the disclosure of the identity of the informant.

## IV

The defendant further claims that the evidence was insufficient to sustain his conviction of carrying a pistol or revolver without a permit because it failed to prove the carrying element of that offense beyond a reasonable doubt. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support

a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Eubanks*, 133 Conn. App. 105, 110, 33 A.3d 876, cert. denied, 304 Conn. 902, 37 A.3d 745 (2012).

Section 29-35 (a) provides, in pertinent part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ." Under this statute, "to obtain a conviction for carrying a pistol without a permit, the state was required to prove beyond a reasonable doubt that the defendant (1) carried a pistol, (2) for which he lacked a permit, (3) while outside his dwelling house or place of business." *State* v. *Douglas*, 126 Conn. App. 192, 209, 11 A.3d 699, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011).

This court has explained that carrying and possession are different concepts. *State* v. *Williams*, 59 Conn. App. 603, 608, 757 A.2d 1191, cert. denied, 254 Conn. 946, 762 A.2d 907 (2000). While "a person can possess an item without carrying it on his person," § 29-35 "is designed to prohibit the carrying of a pistol without a permit and not the [mere] possession of one." Id. Accordingly, constructive possession of a pistol or revolver will not suffice to support a conviction under § 29-35. See *State* v. *L'Minggio*, 71 Conn. App. 656, 672, 803 A.2d 408, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002). Instead, to establish that a defendant carried a pistol or revolver, the state must prove beyond a reasonable doubt that he bore a pistol or revolver upon his person; *State* v. *Williams*, supra, 608; while exercising control or dominion of it. *State* v. *Hopes*, 26 Conn. App. 367, 375, 602 A.2d 23, cert. denied, 221 Conn. 915, 603 A.2d 405 (1992). Because there is no temporal

requirement in § 29-35; see General Statutes § 29-35 (a); and no requirement that the pistol or revolver be moved from one place to another to prove that it was carried; see *State* v. *Hopes*, supra, 375; a defendant can be shown to have carried a pistol or revolver upon his person, within the meaning of the statute, by evidence proving, inter alia, that he grasped or held it in his hands, arms or clothing or otherwise bore it upon his body for any period of time while maintaining dominion or control over it.

Here, the defendant claims that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he ever *carried* a pistol upon his person while outside of his dwelling house. We disagree.

The state's information charged the defendant, in relevant part, with carrying a pistol without a permit "at the City of Bridgeport, *on or about* the 18th day of January, 2010 . . . ." (Emphasis added.) Accordingly, the dispositive issue on this claim of error is whether the evidence supports a finding beyond a reasonable doubt that at some point in time on or about the day of his arrest, the defendant bore a pistol upon his person within the city of Bridgeport.

As previously discussed, the state presented testimony that, upon arriving at the T Market, Stern observed the defendant standing in close proximity to a parked van, the side door of which was open. Delbouno subsequently discovered the pistol inside the van, wrapped in a black plastic bag, and, thereafter, the defendant voluntarily stated that the van belonged to him. A short time later, the defendant further volunteered to Stern that "he was holding[10] [the] weapon for

---

[10] At oral argument before this court, the parties disputed the meaning of the defendant's use of the phrase, "holding the weapon for . . . ." While the defendant contends that the phrase suggests that he was merely maintaining the pistol in his custody, perhaps in a fiduciary capacity, the state counters that the statements reasonably can be read to infer that the defendant had physically maintained his grasp upon the pistol. We conclude that

a guy that he knew named Fats that he [had] met in [the] Greene Homes [apartments in Bridgeport]." On that score, the defendant further volunteered that "he was holding the weapon for Fats, who was supposed to meet him later on . . . in exchange for some heroin folds." This admission was later repeated during the defendant's stationhouse interrogation by Ortiz, when he gave a written statement that provided, in relevant part: "I . . . was at the [Greene Homes apartments when] I [saw] this guy by the name of Fats, a heroin dealer [who asked] me to hold the firearm because he [promised] me heroin." (Internal quotation marks omitted.)

Viewing the defendant's conduct and statements in the surrounding circumstances in the light most favorable to the state, the jury reasonably could have found that the defendant had carried the pistol in violation of § 29-35 on the basis of the following evidence. The defendant had met Fats at the Greene Homes apartments in Bridgeport. While there, the defendant, a reported heroin user, and Fats, an alleged heroin dealer, struck an agreement whereby the defendant would take and retain possession of Fats' pistol for a period of time in exchange for a promised payment in heroin. Pursuant to that agreement, Fats transferred the pistol to the defendant, who carried it to and placed it in his van, where he planned to keep it until Fats returned for it and delivered to him the promised heroin. The evidence further suggests that in the minutes preceding his arrest, the defendant was preparing himself for the contemplated exchange: Stern thus observed the defendant positioned a few feet from the van, with its side door open. Inside the van, the pistol was wrapped in a black plastic garbage bag, as were several other items. The

an examination of the defendant's statements and reported conduct support a reasonable inference that, at some point in time on or about January 18, 2010, the defendant had carried the Uzi-type pistol upon his person.

jury thus reasonably could have found that, upon receiving the pistol from Fats, the defendant carried it to the van, where he personally wrapped it in a black plastic garbage bag for storage until Fats returned to reclaim it in exchange for the promised heroin.

On the basis of the previously described evidence and the reasonable inferences to be drawn therefrom, the jury reasonably could have found that, in the course of holding the pistol for Fats, as he repeatedly claimed to have done, the defendant had carried the pistol upon his person by holding it in his hands and moving it from the Greene House apartments to the van and wrapping it in a black plastic bag before placing it in the van. We thus conclude that there was sufficient evidence to support the jury's finding that the defendant was guilty of carrying a pistol without a permit.

V

The defendant's final claim is that the court improperly denied his motion for a mistrial, which was based upon alleged judicial misconduct stemming from the court's allegedly improper criticisms of defense counsel in the presence of the jury. Specifically, the defendant claims that the court improperly criticized defense counsel to such a degree as to deprive the defendant of a fair and impartial trial.[11] We disagree.

[11] The defendant also contends, in a footnote, that the court's jury instructions, which were not the subject of the defendant's motion for a mistrial, further demonstrate judicial bias. The defendant characterizes this challenge to the court's jury instructions as a challenge to the court's denial of his "motion for a mistrial based on judicial misconduct due to improper criticisms of defense counsel in the presence of the jury." The defendant, in his brief to this court, merely cites a portion of the court's charge, which was given after the defendant moved for a mistrial, in an attempt to bolster his claim that the court improperly had denied that motion. The defendant fails to set forth a suggested standard of review or analysis of this claim. "[T]his court is not an advocate for any party . . . ." *State* v. *Tocco*, 120 Conn. App. 768, 786–87, 993 A.2d 989, cert. denied, 297 Conn. 917, 996 A.2d 279 (2010). To the extent that anything in the defendant's brief could be construed as a challenge to the court's jury instructions, we note that the defendant failed to separately brief this claim and, further, failed to provide

The following additional facts are relevant to our resolution of the defendant's final claim. During the state's case-in-chief, defense counsel moved for a mistrial on the basis of judicial bias. Defense counsel argued in support of that motion that, the previous day, the court had made comments that undermined the credibility of the defense by suggesting to the jury that the court believed "that [defense counsel] was being unprofessional" during her cross-examination of Stern and that defense counsel, in scheduling the testimony of a witness, was inconsiderate of the jury members' time and personal schedules. The court denied the defendant's motion.

"The standard to be employed [for a claim of judicial bias] is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification." (Internal quotation marks omitted.) *State* v. *Holloway*, 116 Conn. App. 818, 829, 977 A.2d 750, cert. denied, 294 Conn. 902, 982 A.2d 646 (2009).

"[T]he principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is

any analysis of it. "[Appellate courts] are not required to review issues that have been improperly presented . . . through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 153 n.19, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Accordingly, we decline to review this claim.

addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In [its] review of the denial of a motion for [a] mistrial, [our Supreme Court has] recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Reilly*, 141 Conn. App. 562, 568, 61 A.3d 598 (2013).

"In [*State* v. *Gordon*, 197 Conn. 413, 426, 504 A.2d 1020 (1985)], our Supreme Court concluded that the trial court's actions, while questionable, did not deny the defendant a fair trial. In reaching its conclusion, the court noted that the record was replete with instances of argumentative conduct toward defense counsel. Id., 425. The court reasoned, however, that the trial court's allegedly improper treatment of defense counsel did not thwart defense counsel's ability to defend his client, as counsel zealously argued numerous motions, fully cross-examined all witnesses and was not constrained in his attempts to have evidence admitted or in his ability to object to actions of the state's attorney. Id., 426; see also *United States* v. *Pisani*, 773 F.2d 397, [404] (2d Cir. 1985) (although some of trial judge's comments and behavior toward defense counsel were regrettable, they did not convey impression of partiality toward government to such extent that it became factor in jury deliberations)." *State* v. *Peloso*, 109 Conn. App. 477, 500–501, 952 A.2d 825 (2008).

The defendant first argues that the court's rebuke of defense counsel during her cross-examination of Stern "is the height of a 'caustic and disparaging' remark and is an improper interference on the part of the trial

judge."[12] In support of his argument, the defendant contends that, due to the court's response, "there could be no such 'atmosphere of perfect impartiality' . . . ." The defendant further contends that the court's "suggestion that defense counsel wanted 'the jury to hang around' in disregard of their personal schedules . . . was a gratuitous remark that gave an unfair impression to the jury of defense counsel and, in turn, the defendant."[13] We disagree with the defendant's description and the purported effect of the court's conduct and, accordingly, reject the defendant's arguments that such conduct deprived him of a fair trial.

---

[12] The statements by the court to which the defendant objects were made in the course of the following colloquy:

"[Defense Counsel]: So, within let's say the thirty seconds, a minute, a minute and a half of you arriving on the scene with your gun, did you check to see if the owner of the van was in the store or running away through the store?

"[Stern]: [Subsequent] to placing [the defendant] under arrest, I checked inside of the [T Market] to see if there were additional witnesses.

"[Defense Counsel]: Was that—no, I didn't ask you if you were looking for other witnesses. I said, were you looking for the possible suspects; other owners of the van?

"[Stern]: I did not, because [the defendant] told me it was his van.

"[Defense Counsel]: I know you think that.

"[The Prosecutor]: Objection. . . . I'd ask that that be stricken; I know you think that. How can anybody read [the] mind of a witness?

"The Court: [Defense counsel], that's an inappropriate approach to examining a witness, and . . . I'm going to forewarn you to refrain from making—editorializing any—any of the witness' testimony. It's inappropriate and—and it's very unprofessional."

[13] The statements by the court to which the defendant objects were part of the following colloquy:

"The Court: . . . [I]s that your final witness?

"[Defense Counsel]: I don't know, Your Honor.

"The Court: You don't know?

"[Defense Counsel]: No.

"The Court: Okay. And you want the jury to hang around until 2 o'clock now, right, and not know if there's any other witnesses?

"[Defense Counsel]: I am working on it as we speak, based on the speedy information that I mentioned to Your Honor earlier.

"The Court: Well, you haven't mentioned anything to me. You've mentioned that something's come up, but I don't know anything about it yet."

We first note that in each instance defense counsel invited the court's reprimand. "The Superior Court has inherent and statutory authority to regulate the conduct of attorneys who are officers of the court." (Internal quotation marks omitted.) *State* v. *Drakeford*, 63 Conn. App. 419, 424–25, 777 A.2d 202 (2001), aff'd, 261 Conn. 420, 802 A.2d 844 (2002). "In its execution of this duty, the court has broad discretionary power, and we will accord every reasonable presumption in favor of its actions. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Peloso*, supra, 109 Conn. App. 499.

Here, the court's response to defense counsel's comment on Stern's testimony and its remarks as to the failure of defense counsel to disclose its witnesses did not rise to such a level as to convey an impression of partiality. As to the court's admonition of defense counsel concerning her cross-examination of Stern, our review of that portion of the trial transcript reveals that defense counsel made a gratuitous remark while cross-examining Stern, thus prompting the court to rebuke defense counsel against "editorializing" Stern's testimony and to comment that her approach was "very unprofessional."[14] In thus intervening, the court fulfilled its responsibility to ensure that the jury was not misled. We conclude that there was nothing inappropriate in the court's admonition of defense counsel and, accordingly, that the court acted well within its discretion in warning her not to persist in such a tactic.

---

[14] Outside the presence of the jury, the court further explained its concerns: "[M]y comment to you regarding your conduct with regards to . . . Stern, that was unprofessional conduct. It was inappropriate conduct. You personalized your cross-examination of the witness. You were confronting the witness in a personal manner, you were challenging his credibility, which no attorney has the right to do."

We find even less persuasive the defendant's argument that the court demonstrated bias toward defense counsel, and, in turn, toward the defendant, when asking if she would be calling additional witnesses. Although a "trial judge should be cautious and circumspect in his language and conduct and should conduct a trial in an atmosphere of impartiality," "a passing display of exasperation, though worsened by its repetition, falls far short of a reasonable cause for disqualification for bias or prejudice . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Herbert*, 99 Conn. App. 63, 69–70, 913 A.2d 443, cert. denied, 281 Conn. 917, 917 A.2d 999 (2007).

Our review of the record reveals that shortly before the court's challenged conduct occurred, defense counsel had informed the court that she possibly would call a "mystery witness." Elaborating upon its concerns, the court explained: "When I addressed the question of expecting the jury to wait till 2 o'clock, I was not referencing [any witness that previously had been scheduled], I was referencing what you never disclosed to me ever until later on when we excused the jury about this mystery witness that you just discovered as someone that you might want to call and you were dealing with this information you received about this witness. I have no knowledge of any of that. . . . And when you . . . start bringing in other people that have not even been disclosed to the jury during voir dire, disclosed to the court for purposes of scheduling, it concerns the court." Accordingly, we conclude that the court acted well within its authority to regulate the conduct of defense counsel, who had failed to disclose information concerning the defendant's witnesses to the court.

Furthermore, the defendant does not claim, and the record does not show, that the court's reproach of

defense counsel or statements concerning the scheduling of witnesses, in fact, had limited defense counsel's ability to cross-examine Stern fully or otherwise to maintain a vigorous and thorough defense of the defendant. We thus conclude that the court's actions did not constitute judicial misconduct or so prejudice the defendant as to deny him a fair trial.[15]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[15] The defendant also claims that the following statement by the court, made outside the presence of the jury, further demonstrated judicial bias:

"The Court: There's no . . . sequestration order, and when you make a statement like that, you're really confusing the jury and . . . I think you're damaging the case, to be very candid. You can ask [Stern] about his recollection, you can ask him about prior testimony; that's appropriate. He's also allowed to explain any inconsistencies in the December [3, 2010] testimony and today. I mean, he's certainly going to be asked about it by [the prosecutor] when you're finished."

"We dispose of [this] allegation summarily, noting that any misconduct that occurred outside the presence of the jury could not possibly have had an impact on its verdict." *State* v. *Tatum,* 219 Conn. 721, 742, 595 A.2d 322 (1991).

